**LITTLE ROCK SCHOOL DISTRICT, Plaintiff,**

v.

**PULASKI COUNTY SPECIAL SCHOOL DISTRICT, et al., Defendants,**

**Ms. Lorene Joshua, et al., and Katherine Knight, et al., Intervenors.**

**Civ. No. LR–C–82–866.**

United States District Court, E.D. Arkansas, W.D.

July 6, 1990.

See also 726 F.Supp. 1544.

Christopher Heller, Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.

M. Samuel Jones, Wright, Lindsey & Jennings, Little Rock, Ark., for Pulaski County Sp. School Dist.

Stephen W. Jones, Jack, Lyon & Jones, Little Rock, Ark., for North Little Rock School Dist.

Norman Chachkin, NAACP Legal Defense Fund, New York City, and John W. Walker, Little Rock, Ark., for Joshua intervenors.

John T. Lavey, Little Rock, Ark., for Nola Burl intervenors–Parents Plan.

Paul L. Cherry, Asst. Atty. Gen., State of Ark., Little Rock, Ark.

H. William Allen, Little Rock, Ark., for the Ark. Dept. of Educ.

## ORDER

HENRY WOODS, District Judge.

In my years as district judge in this difficult case involving the three school districts in Pulaski County, I have attempted to oversee the implementation of positive desegregation plans which would benefit all children in the public schools. To that end, I have sought the help of the most progressive and able persons in this country.

I appointed Mr. Aubrey V. McCutcheon, Jr. as Special Master. Mr. McCutcheon has guided other districts, including Buffalo, San Francisco and Jacksonville, Florida, through the planning and implementation of education-oriented plans which not only right the wrongs suffered by African–American children, but provide rich educational opportunities for all children.

When the districts submitted incomplete plans in the Spring of 1989, I appointed Mr. Eugene Reville as Metropolitan Supervisor to help the districts complete and perfect them. Mr. Reville, who enjoyed an international reputation, had served for fourteen years as the Superintendent of the public schools in Buffalo, New York, one of the most successful desegregation stories in this nation.

It has been my intention to oversee a progressive educational plan to serve the children of these districts into the twenty-first century. Such a plan would bring peace to a community long plagued with a worldwide reputation for racial problems in its public schools. However, I have steadfastly resisted the notion of peace-at-any-price. In the words of Martin Luther King, Jr., what the children in this community, black and white, need and deserve is "[n]ot a negative peace which is the absence of tension, but a positive peace, which is the presence of justice."

I still believe that the solution which makes common sense for the children in this community is consolidation of the school districts. I believe that, had the Court of Appeals affirmed that decision in 1984, we would now be several years into a productive workable plan. Instead, the Appellate Court, while affirming each of the one-hundred-five findings of fact in the 1984 decision, reversed the remedy and mandated a remedy of its own which turned primarily on redrawing boundary lines. In the five years since consolidation was rejected by the Court of Appeals, all efforts to untie this Gordian knot have inevitably resulted in one-year, stop-gap measures instead of sensible long-term plans.

The task of overseeing the development of plans within the Appellate Court's newly drawn boundary lines was remanded to me. The Court of Appeals mandated that each district balance its schools within 25% plus or minus of the percentage of either black or white children. The guideline was later modified to be calculated at 25% plus or

minus the percentage of the black enrollment. Because the racial makeup of the three districts varied so greatly, a racial percentage which was "too black" in Pulaski County Special School District (PCSSD) under the Eighth Circuit guidelines was, by definition, "too white" in the Little Rock School District (LRSD).

Furthermore, the redrawing of these boundary lines left the PCSSD a sprawling 729 square-mile district with three distinct sectors geographically isolated from one another. In an effort to implement a common-sense solution, in 1987, I approved a plan for PCSSD in which all the schools in each distinctive sector would be racially balanced within the sector. The Little Rock School District and black intervenors appealed that plan and, again, the Court of Appeals reversed the remedy. I was directed to order a plan which required all PCSSD schools to meet the guidelines calculated on the racial percentages of the PCSSD as a whole. That is, all PCSSD had to fall within 18 to 30% black. The Court added a requirement that no child could be bused more than 45 minutes for desegregation purposes.

I appointed Mr. McCutcheon as Special Master because of his expertise in developing common-sense, workable desegregation plans and because of his expertise in school finance to ensure compliance with the mandate of the Court of Appeals. At the time of his appointment, the liability of the State of Arkansas to the LRSD was yet to be determined. One of Mr. McCutcheon's principal responsibilities was to determine the precise amount of the State's liability under the Court of Appeals mandate—a figure that everyone predicted would run into millions. Myriad hearings and conferences were held on this issue. When Mr. McCutcheon had reached the point of arriving at the precise figure, the parties requested a delay on the ground that they believed a settlement could be reached. This request was granted, and a settlement

was reached by the parties under which over one-hundred-million dollars was to be paid to the districts. Two features of this settlement were unacceptable to me. Under the settlement, the parties agreed that there would be no more magnet schools and that the attorneys for the Joshua intervenors would be paid 2.4 million dollars out of the funds to be received by the LRSD. Subject to these modifications, I approved the settlement.

As for the desegregation plan itself, the Special Master, in agreement with all of the parties in the case, determined that a tri-district plan was the only long-term solution, given the various requirements of the Court of Appeals. In the Spring of 1989, after the parties had been given a "stabilizing year" in which to plan, he recommended the approval of the broad concepts agreed to by the parties, but recommended that a Metropolitan Supervisor be appointed to guide the completion, development and implementation of the plan.[1] I agreed with that recommendation and appointed Mr. Reville.

Under the guidance of Mr. Reville, the school districts and the parents developed an adequate—albeit minimal—desegregation plan. He proposed a plan for neighborhood schools, but it was combined with a number of additional magnet and incentive schools and a building program locating schools in such a way as to promote integration. Without the magnet schools and the proposed building program, it was and is my feeling that Mr. Reville's plan would be constitutionally defective. The three school districts and the black intervenors appealed the appointment of a Metropolitan Supervisor, and the plans which the districts themselves and their parents had developed and submitted.

A hold has now been placed by the Court of Appeals on the development of additional magnet schools and the construction of any new schools "absent agreement of all

---

**1.** After reviewing the most recent decision by the Court of Appeals, Mr. McCutcheon has asked to be relieved from his appointment as Special Master in this case. I feel I must honor this request, and he is, accordingly, relieved.

The children in these districts, black and white, have known no better friend. Mr. McCutcheon should submit any outstanding fees or expenses forthwith to the parties to be paid in the manner previously ordered.

parties." From past experience I can state that an agreement will never be reached for additional magnet schools. It should be remembered that in their settlement agreement the parties settled on no more magnet schools. It is obvious that Mr. Reville's projected magnet school program, which would have offered so many exciting new programs to the children of this county, is now terminal.

Thus we are now in the throes of another of the many appeals perfected in this case, some of which have accomplished nothing but enrichment of the participating attorneys. On this subject the time has come to speak frankly. Lawyer fees paid by the three districts in this litigation have been grossly exorbitant. This is a principal reason for the poor financial situation in which the schools find themselves. In one recent year alone the LRSD paid over $600,000, including billing for 31 days in a 30-day month. The office of the Metropolitan Supervisor has requested a national accounting firm to ascertain just how much the three districts have paid out in legal fees since this litigation began. I am sure the figures will be shocking.

We are now faced with an order from the Court of Appeals which effectively halts any substantial progress toward a solution of the manifold problems of these school districts. For the 1990–91 school year only, the Court of Appeals has directed the districts to implement programs developed by Mr. Reville and the community in the Tri-district plan "if planning can be completed in time." (July 2, 1990 Order at p. 2)

The Court has issued a moratorium on any new construction under the Tri-district plan (or any other plan) unless there is unanimous agreement among the parties.[2] Since new school construction requires a minimum of one year, the prospects of any new school being ready for use in the 1991–92 school year are remote. This means, of course, that one hundred percent of the mandatory busing burden for desegregation will continue to rest on the shoulders of the black children for two more years, at the least. These are the children for whose benefit this lawsuit was brought. The parents of these children must surely wonder when the courts and their lawyers will kindly stop "helping" them.

The Court of Appeals has now ordered that the settlement money from the State of Arkansas, paid to compensate for the damage to black children caused by the State, be paid directly to the school districts. The districts have blatantly maintained that they are not required to spend this money on the purpose for which it was paid—that is, to repair the harm done to black children at the hand of their state government. By the time the full order of the court is issued in the fall, tens of millions of dollars will have been placed in the hands of these school districts, and will have been spent. The district court will be left between Scylla and Charybdis, trying to implement a long-term desegregation plan, yet to be announced, with insufficient funds remaining to implement any meaningful plan.

While the Court of Appeals has not directed me to refrain from hiring a Metropolitan Supervisor, the Order leaves the job description so ambiguous that I know of no first-rate educator who would be interested. It would be a waste of judicial time to continue the search at this time. If members of the current staff of the Metropolitan Supervisor, either professional or clerical, wish to return to their jobs with the school districts prior to the agreed-upon three-year commitment, the school districts must reinstate them. (This was the agreement between Mr. Reville and the Superintendents at the time the staff was hired.) The school districts are barred from retaliating in any way for the work of these

2. Ironically, according to the order of the Court of Appeals, the parties can break ground tomorrow for their agreed-to school in the Crystal Hill area. It is uncontroverted that the Crystal Hill location is in a virtually all-white area (the Northwest sector of PCSSD) near Pine Forest Elementary School (Maumelle) which, at 85% white, has never been within the Eighth Circuit guidelines. Crystal Hill is miles from any significant numbers of black children, regardless of their school district. Yet there can be no construction of schools recommended in the Tri–District Plan, all of which are in race-neutral areas.

dedicated people with the Metropolitan Supervisor.

Whatever the plan finally mandated by the Court of Appeals, those who take as their part delay and obstruction will have won. For those people, delay is victory, regardless of the cost to the school children or to a community economically stagnant because of the "school mess."

I am unable to successfully implement a plan to bring equity to the children of this county under the restrictions imposed by the Court of Appeals. Perhaps the application of a fresh mind and the perspective of another judge can find hope in a situation which I perceive as hopeless. The time has come for another judge to assume the burden of this litigation since it is my unalterable decision to recuse. Therefore, I do hereby recuse, effective upon the entry of this order, and I do hereby so notify the Clerk to the end that the case may be promptly reassigned in accordance with the rules of the Court.